Argued January 11, affirmed February 13, 1929.

## SOUTHEAST PORTLAND LUMBER CO. *v.* W. M. HEACOCK AND THE ADJUSTMENT BUREAU OF THE PORTLAND ASSOCIATION OF CREDIT MEN.

(275 Pac. 28.)

252

For appellant there was a brief over the name of *Messrs. Clark, Skulason & Clark,* with an oral argument by *Mr. A. E. Clark.*

For respondent there was a brief over the name of *Mr. John Van Zante,* with an oral argument by *Mr. Albert H. Tanner.*

ROSSMAN, J.—The uncontradicted evidence establishes, that when the defendant found his business in a precarious condition, and himself confronted with grave possibility of bankruptcy, he called upon the Adjustment Bureau Portland Association of Credit Men at the suggestion of a friend. Here he explained in full his financial condition to a Mr. Ingram, manager of the Bureau; the latter's advice was that the defendant should authorize the Bureau to issue a call for a meeting of his creditors. The defendant accepted this advice and upon the same day the Bureau issued a request that all of the creditors of the defendant attend a meeting in the Bureau's offices September 29th. On that day substantially all of the creditors met at the appointed place. It is agreed, that Mr. Ingram presided at the meeting, and that at his suggestion the defendant addressed his assembled creditors, explaining to them his embarrassed financial condition; that in his discourse he offered to make an assignment to the Adjustment Bureau of all his nonexempt property for the benefit of his creditors; that at the conclusion of his address he retired from the room and awaited outside the conclusion of the meeting; that later Mr. Ingram came forth and stated that the creditors had decided to accept his offer of an assignment to the Bureau; that Mr. Ingram at once prepared the document and the defendant executed it and placed the Bureau in charge of the assigned estate; that at the same time Mr. Ingram prepared a mimeographed letter addressed in

general to all the creditors advising them of the assignment; that the following day the defendant and his wife executed and delivered to the Bureau a deed to some real property which constituted a portion of the assigned estate; that the Bureau at once took possession of the estate and proceeded with its liquidation; that the creditors, including the plaintiff, filed their claims, and lastly it is agreed that two dividends were paid, the aggregate sum being in excess of 50 per cent. All creditors, except the plaintiff, received and cashed their second dividend check which was so prepared that it constituted a final release for the defendant. No such check was sent to the plaintiff because it had become indebted to the Bureau in an amount equal to its claim through purchase from the trustee in assignment. Neither the instrument of assignment, nor the mimeographed letter mentioned a release. The plaintiff received and cashed its first dividend check.

1, 2. There is a conflict in the evidence, as to whether the defendant in his address to the assembled creditors made his offer of an assignment conditional upon a release from further liability if his estate should prove insufficient to liquidate their demands, or whether this condition was unmentioned except in his personal conversation with an occasional creditor. The evidence seems to indicate, that his creditors did not discuss a release; it is agreed that they accepted his offer for an assignment. Fifteen to twenty-five of the creditors attended the meeting; ten of these, including the defendant and Mr. Ingram, testified during the course of the trial. Seven of these ten heard the defendant say, that his offer was conditional upon a release. It is true, that all seven did not testify that they heard this statement made

as a part of the defendant's general address; some heard it in private conversation during the course of the meeting. To these seven, Mr. Ingram could be added, because he admitted that immediately before the meeting convened he told some of those who had arrived early, that the defendant would expect a release. The remaining two consist of the plaintiff's representative, and an individual who was not a creditor. They did not testify, that the defendant failed to speak of a release, but that they did not hear that subject mentioned. Three, perhaps four, of those present, testified, that the condition of a release was a part of the statement which the defendant made to the entire meeting. One of those, who testified that he heard of the condition attached to the offer in private conversation with the defendant, testified that the latter spoke in a "loud voice," and that it provoked considerable discussion among those around him. Explaining, perhaps, the failure of all those present to hear clearly what was said, is the fact that noise and confusion attended the meeting, and it was poorly conducted. It also seems, that some of those present were partially occupied in the preparation of their claims, and in making notations concerning the assigned property. None testified that the alleged statement concerning a release was not made; plaintiff's representative would go no further than testify "I didn't hear it." This, we believe, is an instance in which affirmative evidence is more valuable than negative evidence. The able judge of the Circuit Court evidently found that the evidence supported the contention that the offer of an assignment was a conditional one; we find no occasion to conclude otherwise. The determination of the foregoing issue does not depend entirely upon a com-

parison of the testimony of the witnesses whom we have just mentioned. Before the defendant's wife would execute the deed, to which we have adverted, she inquired of Mr. Ingram whether the defendant would be released from further liability if the assigned property failed to discharge all debts. The reply was, that the request for an assignment was accompanied with a provision for a release. The admissibility of Mr. Ingram's answer is challenged by the plaintiff as hearsay evidence. It will be observed that his statement was not a mere narrative of a past transaction, but was a verbal act performed by the assignee in the transaction of his duties; if the assurance of a release had not been given, the execution of the deed would not have occurred. The property conveyed by the deed became a portion of the assigned estate.

3–5. We believe this evidence was admissible: Or. L., Section 707; Wigmore on Ev. (2 ed.), § 1772. The final dividend check mailed to the creditors, the letter that accompanied it, and an entry upon the claim sheet kept by the Bureau, all stated that when the assignment was made, it was agreed that the defendant should be released from further liability. Mr. Ingram did not concede, that Mrs. Heacock had correctly related his statement to her, and the plaintiff offered an explanation of the various writings previously mentioned, which bore evidence of the alleged release. Although we have carefully read the plaintiff's explanation, the impression remains in our mind, that these four pieces of evidence, which support the defendant's contention, are closely related to the truth. This evidence was not objected to, although the plaintiff's brief in this court assumes it was inadmissible as being utterances of a party for

whose declarations the plaintiff was not responsible, and that, therefore, it was hearsay evidence. The plaintiff concedes that the Bureau was assignee of the estate; hence, the relationship between the Bureau and the plaintiff was that of trustee, and *cestui que* trust. When the trustee made this entry upon its claim sheet, indorsed its final dividend checks with a notation that the assignment was accompanied with an agreement for a release, and transmitted with the checks a letter to like effect, its acts were not that of idle narrative, but constituted a part of the liquidation of the estate. They were evidence of the practical construction placed upon the trust agreement. It is true, that the construction placed upon an agreement by one party alone is not admissible to establish the true meaning of the agreement; 13 C. J., Contracts, p. 549; yet, the proof went further, for it was shown that all the creditors accepted these final dividend checks. We have already explained, that no such check was sent to the plaintiff, because its indebtedness to the estate equalled the amount due from the latter to it. Thus, it appears, that all the creditors except the plaintiff, acquiesced in this interpretation. We shall shortly mention another item of evidence which we believe indicates the plaintiff's concurrence in a like view. We know of no rule of procedure that enables a party to object to the admissibility of evidence for the first time on appeal, even in an equity suit. The trial before us is *de novo,* but by common practice it is established, that the objections are offered in the court below. Sound reason supports this practice, for it is altogether possible that many objections could be surmounted by the offer of additional evidence if the objection is voiced. The above we believe disposes of the objections pre-

sented to us. Moreover, the modern conception diminishes the force of the hearsay objection when a case is tried without a jury.

6. It may be objected, that conceding all of the foregoing, the evidence falls short of proving that there came to the ears of the plaintiff the information, that the offer of an assignment was accompanied with a desire for a release. The call for the meeting was not such as to subject each participant to the will of the majority, and no resolution to that effect was adopted. But, there is uncontradicted evidence, which we believe justifies the conclusion that before the plaintiff filed its claim it learned that Mr. Pleier was mistaken in his understanding of what occurred at the creditors' meeting. In the following testimony Pleier states his version of the agreement reached between the defendant and his creditors:

"A. He suggested that he would be willing to assign his assets and his liabilities over to the Adjustment Bureau and have the Adjustment Bureau handle all the funds and conduct the business for him until such time where the business would be in a better paying way and he got more of his creditors paid up, at which time he would handle the business again and try and pay up all his creditors.

"Q. Did the creditors take any action on the proposition of his?

"A. After some discussion, why, they thought it was the proper thing for Mr. Heacock to do."

If Pleier's explanation is true, the transfer of title was a purely temporary arrangement effected to enable the defendant to discharge his debts and then resume the management of his affairs. Such a device would not contemplate a liquidation of the assigned property. Yet, before us, it is conceded, that at that meeting an assignment for the benefit of

creditors was agreed upon. Pleier did not file the plaintiff's claim until several days after the meeting. Before it was filed, opportunity presented itself for him to discover that he was in error concerning what occurred at the meeting; for instance, immediately at its close, a mimeographed letter was sent to all of the creditors advising them that an assignment had been made; a few days later Pleier and the defendant conferred, and later agreed upon the amount of plaintiff's claim, and a representative of the assignee at approximately this time conferred with the plaintiff in regard to the purchase by the plaintiff of a large quantity of lumber and a sale of the plant. Having become acquainted with the fact, that he was in error in regard to what occurred at the meeting, it was Pleier's duty to ascertain the terms of the assignment before he filed the plaintiff's claim. Had he made inquiries, we believe that, he would have discovered, that the assignment was accompanied with a promise for a release. Under the circumstances we believe that the plaintiff should be dealt with as though it had actually acquired this information.

7. A written instrument, as evidence of the engagement of the parties, is a favorite of the law. It generally bears its opponent's signature, or other badge of his approval. Thus, it comes into the record peculiarly equipped to persuade all, that it is a true witness of the terms and conditions of the agreement. For this reason, perhaps, we have the rule that proof which would warrant a court in reforming such a document must possess a very high degree of cogency: *Sneed* v. *Santiam River Timber Co.*, 122 Or. 652 (260 Pac. 257); *L. B. Menefee Lbr. Co.* v. *Gamble*, 119 Or. 224 (242 Pac. 628); *Jones* v. *Bramwell*, 111 Or. 316 (226 Pac. 694).

8. We are satisfied, that the mistake alleged in the complaint was made, and that it was mutual. We have carefully considered the plaintiff's contention, that the defendant desired merely an extension of time, but the evidence persuades us to the conclusion just announced. The proof possesses the degree of effectiveness demanded by the law.

9. We particularly examined the plaintiff's contentions, that the defendant's failure to observe the omission in the instrument of assignment was so negligent that he is not entitled to the aid of a court of equity in its reformation. The degree of carelessness upon the part of a suitor, which bars reformation, was expressed in these words in *Howard* v. *Tettelbaum*, 61 Or. 144 (120 Pac. 373); "Negligence in order to bar equitable relief, in case of mutual mistake, clearly established, must be so gross and inexcusable as to amount to a positive violation of a legal duty on the part of the complaining party." See, also, *Welch* v. *Johnson*, 93 Or. 591 (183 Pac. 776, 184 Pac. 280). While the defendant was a business man, who had received the benefit of a high school and business college education, yet he had had no experience in the preparation of legal documents. He entrusted the drafting of this document to Mr. Ingram: it was evident to the defendant, that Ingram, as manager of the Bureau, had become well versed in the preparation of such documents, and in the management of assigned estates. The defendant was not represented by an attorney, and had consulted none. He testified, that he made it clear to Mr. Ingram, that he desired the latter to be watchful of his interests. The Adjustment Bureau transacts a large volume of business, and is possessed of a good reputation for integrity and efficiency. There was nothing in the

nature of the transaction, nor in the character of the party with whom the defendant dealt, to make him suspicious, or suggest that he employ unusual alertness. When Mr. Ingram prepared the assignment instrument, he availed himself of a printed form; the use of prepared forms generally has the effect of assuring the client that the general practice is being adhered to. The following day, as we have previously observed, Mrs. Heacock was advised that the release was provided for; this was in the presence of defendant. And a day or two later, upon inquiry, the latter was told by Mr. Ingram, that all of the provisions and assurances forming a part of the assignment and release could not be inserted in the one instrument, but that they would all be provided for in due time. Under these circumstances we find no evidence of such lack of prudence upon the defendant's part that a court ought to refrain from correcting the mistake.

10. The plaintiff challenges the sufficiency of that portion of the answer which pleads the equitable defense. It contends, that the answer fails to excuse the defendant's neglect in discovering the omission of the release clause in the assignment, and that the particulars of the alleged mistake are not pleaded with sufficient particularity. No motion or demurrer was interposed to the answer; throughout the trial below, no evidence was objected to on the ground of surprise, nor did the plaintiff at any time contend that any fact was not pleaded sufficiently to foreshadow its probable proof. Apparently the shortcomings of the answer are called to our attention for the first time on appeal. While the plaintiff earnestly argues these questions of pleadings, we do not believe that an extended review of the rules of pleadings is de-

manded. When a pleading, whose sufficiency has not been challenged by motion or demurrer has served the function of notifying an opponent of the course to be pursued at the trial, it has discharged its principal duty: Clark on Code Pleading, § 55. If in addition, it has assisted in the formulation of the issues, no more should be demanded of it. When a pleading has met these two tests, and a cause has gone to judgment, no sound reason can be assigned in the abstract administration of justice for regarding the pleading, whose usefulness has been spent, as a dying ember which shall spring into flame upon appeal, and destroy the judgment. While the established practice will not permit the courts to go as far as this logic would warrant, rules for the construction of pleadings after judgment, or decree have been devised which sustain many pleadings upon postponed attack when the same would have been declared fatally defective had the question been timely presented. Thus, for instance, even in strict construction states, a pleading is liberally construed when its sufficiency is questioned for the first time on appeal. This court has frequently stated, that when the attack upon a pleading is delayed until after judgment every reasonable inference should be drawn in favor of the pleading: *Rosenberg Co.* v. *General A. F. etc. Corp.*, 98 Or. 118 (193 Pac. 441); *Welch* v. *Johnson*, 93 Or. 591 (183 Pac. 776, 184 Pac. 280); *Osborn* v. *Ketchum*, 25 Or. 352 (35 Pac. 972); *Hyland* v. *Hyland*, 19 Or. 51 (23 Pac. 811). Under such reasoning, pleadings not substantially dissimilar from the one before us have been upheld where the attack was not made until after decree: *Hyland* v. *Hyland, supra; Osborn* v. *Ketchum, supra; Welch* v. *Johnson, supra.* It follows that the pleading was sufficent.

The decree of the Circuit Court should be affirmed. The defendant may have its costs.     AFFIRMED.

COSHOW, C. J., and RAND and McBRIDE, JJ., concur.